UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AARON GLASER,
                       Plaintiff,

        -v-

UPRIGHT CITIZENS BRIGADE LLC.
*et al.*,
                       Defendants.

18-CV-971 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

    Plaintiff Aaron Glaser, a stand-up comedian, alleges that Defendants — various affiliated comedy theaters and schools based in New York City and Los Angeles, as well as associated individuals — violated Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*, as well as state and city law when he was banned from their premises and classes.  Defendants move to dismiss Glaser's operative complaint for failure to state a claim upon which relief can be granted.  For the reasons that follow, Defendants' motion is granted.

**I.    Background**

    **A.    Factual Background**

    The following facts are drawn from Glaser's Third Amended Complaint (Dkt. No. 98 ("TAC")) and are presumed true for the purposes of the instant motion to dismiss.

    This dispute arises out of Defendants' banning of Plaintiff Aaron Glaser from their facilities and classes.  Defendants are a group of affiliated individuals and corporate entities that provide improvisational and sketch comedy training as well as comedy performances in New York City and Los Angeles, known collectively as the Upright Citizens Brigade or "UCB."[1]

---

[1] Specifically, Defendants are: Upright Citizens Brigade LLC; Upright Citizens Brigade Training Center LLC; Upright Citizens Brigade Training Center LA, LLC; UCB Inner Sanctum,

(TAC ¶ 13.) UCB "offer[s] affordable, high-quality shows seven nights a week" in its four theaters and runs "one of the largest and most respected improvisation and sketch comedy schools in the country" (the "Training Center"). (*Id.*)

The Training Center is accredited as a non-degree-granting institution by the National Association of Schools of Theatre. (TAC ¶ 59.) Basic coursework at the Training Center comprises certain "core classes." (TAC ¶ 62.) Completion of those classes qualifies the attendee for a "diploma," and, if he or she so chooses, the opportunity to apply for classes in the Training Center's selective "Advanced Study" program. (TAC ¶¶ 65–67.) As the Training Center's guide explains, the Training Center is run separately from the theaters. (TAC ¶ 68.) The two are intertwined, however: Training Center students may apply to perform in or write for certain shows and opportunities at the theaters, and present and former students receive preferential or exclusive access to some performance opportunities. (*See id.* ¶¶ 68–69.)

Glaser enrolled in the entry-level class at the Training Center, Improvisation 101, in 2006, when he was a college student. (TAC ¶ 87.) By 2010, he had abandoned college in favor of pursuing his comedy career and had completed the core classes for both improv and sketch comedy. (*See* TAC ¶¶ 88, 91.) In that time, Glaser excelled, gaining a coveted position on multiple improv comedy teams that performed at UCB's New York theaters. (*See* TAC ¶¶ 93–98.) He did not remain on those teams or take or apply for any Training Center classes after 2010. During the six years between his last Training Center class and the events giving rise to this lawsuit, Glaser received email solicitations inviting him to apply to various opportunities,

---

LLC; UCBTLA, LLC; Susan Hale, the Managing Director of the California-based UCB affiliates; Alex Sidtis, the Managing Director of the New York-based UCB affiliates; Patricia O'Neill, the Artistic Director of the New York-based UCB affiliates; and 5419 Sunset Properties, LLC, an entity that leased property to UCB. (TAC ¶¶ 13–29.)

but he has not alleged that he applied to or intended to apply to the Training Center's advanced programming.

In 2010, Glaser decided to reorient the focus of his career toward standup comedy, and away from improv and sketch comedy (the subjects of the Training Center's courses). To that end, he began re-establishing himself as a standup comedian. (TAC ¶ 99.) Around 2013, Glaser began producing and hosting a monthly standup comedy series entitled "Midnight Stand-Up" at one of UCB's New York theaters. (TAC ¶ 106.) Glaser was not compensated for his show but received free drinks and free admission to other shows, as well as comped tickets for friends. (TAC ¶ 149.) In 2014, Midnight Stand-Up was selected for inclusion in the Del Close Marathon, an annual festival produced by UCB. (TAC ¶ 111.)

In August 2016, Glaser was called into a meeting with Defendants Shannon O'Neill and Alex Sidtis, the New York directors of UCB. (TAC ¶¶ 3, 168.) At the meeting, Glaser was informed that there had been multiple rape allegations made against him. (TAC ¶¶ 169–170.) Sidtis and O'Neill never provided Glaser with the factual underpinnings of the allegations or an opportunity to respond. (TAC ¶ 171.) They summarily terminated Glaser's show and banned him from Defendants' premises in New York and California. (TAC ¶ 175.) Glaser alleges that the allegations are baseless and that the ban and resulting public attention have had devastating effects on his professional and personal life. (*See* TAC ¶ 201.)

### B. Procedural History

Glaser commenced this action by filing a complaint against Defendants UCB LLC, O'Neill, and Sidtis ("the Initial Defendants") on February 4, 2018. (Dkt. No. 1.) After the Initial Defendants moved to dismiss Glaser's claims against them (Dkt. No. 15), Glaser filed the First Amended Complaint, this time asserting claims against the remaining defendants. (Dkt. No. 25 ¶ 1.) On March 28, 2019, this Court dismissed the federal claims in the First Amended

Complaint for failure to state a claim upon which relief may be granted and declined to exercise supplemental jurisdiction over the remaining state- and city-law claims, but granted Glaser leave to replead.  *See Glaser v. Upright Citizens Brigade, LLC*, 377 F. Supp. 3d 387 (S.D.N.Y. 2019).  On May 2, 2019, Glaser filed his Second Amended Complaint.  (Dkt. No. 92.)  On May 15, 2019, Glaser filed the now-operative Third Amended Complaint.  (Dkt. No. 98.)

Before the Court now is Defendants' motion to dismiss the Third Amended Complaint for failure to state a claim upon which relief can be granted.  (Dkt. No. 111.)  The motion is fully briefed and ripe for the Court's consideration.

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In other words, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555 (citation and footnote omitted).  In assessing a Rule 12(b)(6) motion, "[c]ourt[s] must . . . 'draw [ ] all inferences in the plaintiff's favor.'"  *Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 478 (S.D.N.Y. 2013) (second alteration in original) (quoting *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006)).  In addition to "the allegations on the face of the complaint," courts considering Rule 12(b)(6) motions also "may permissibly consider documents . . . that are attached to the complaint or incorporated in it by reference."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d. Cir. 2007).

### III. Discussion

#### A. Title IX

Glaser alleges that the ban violated Title IX, which states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). At issue in this case is whether the ban deprived Glaser of the benefits of an *education* program receiving Federal financial assistance. Resolution of that issue requires a brief review of Title IX's text and history.

In *Grove City College v. Bell*, the Supreme Court determined that the receipt of federal financial assistance by one part of an institution did not trigger institution-wide Title IX coverage; interpreting the term "program or activity," the Court held that Title IX extended only to the *particular* program or branch that received the federal funds. *See* 465 U.S. 555, 571–75 (1984). Congress responded by repudiating that interpretation and passing the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259 (1988) (codified at 20 U.S.C. § 1687), which redefined the term "program or activity." The statute now defines the term "program or activity," in relevant part, to mean "all the operations of . . . an entire corporation . . . or other private organization" to which financial assistance is extended "as a whole," or, if assistance is not extended to the entity as a whole, to "the entire plant or comparable, geographically separate facility to which Federal financial assistance is extended." 20 U.S.C. § 1687. Accordingly, it is now settled law that the entire entity, or entire geographically separate subunit, is considered to receive federal financial assistance within the meaning of Title IX if any program or subdivision within it receives federal funding.

Title IX, however, contains another limitation: it applies only to "*education*" programs or activities. 20 U.S.C. § 1687 (emphasis added). The statute does not define "education." Courts

have therefore been left to reconcile the statute's broad definition of "program or activity" with the modifier "education," which, under normal rules of statutory interpretation, must be read to be given independent content if possible.  *See O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997).

Does the determination that part of an institution is educational within the meaning of the statute trigger institution-wide Title IX coverage, parallel to the application of the federal-financial-assistance limitation?  This question bears on the outcome of the case because Glaser and Defendants agree that the Training Center's *coursework* is a covered educational program.  If that concession triggers institution-wide coverage, banning Glaser from *any* of UCB's programming — educational or otherwise — would violate the statute.

Though it has not decided a case that directly controls the question, the Second Circuit, in deciding a closely related issue, has relied on an example from the legislative history of the statute that strongly supports applying a program-by-program, rather than institution-by-institution analysis:

> If a private hospital corporation is extended federal assistance for its emergency rooms, the pediatrics department, admissions, discharge offices, etc., are covered under Title VI, section 504, and the Age Discrimination Act.  Since Title IX is limited to education programs or activities, it would only apply to the students and employees of educational programs operated by the hospital, if any.

*Id.* (quoting S. Rep. No. 100-64, at 18 (1988)).  Courts in this Circuit have applied this understanding, too.  *See Romero v. City of New York*, 839 F. Supp. 2d 588, 614 (E.D.N.Y. 2012).  And both parties here seem to implicitly endorse the interpretation of the statute embodied by the above illustration.  The Court therefore proceeds on the shared understanding of the parties, courts within this Circuit, and the well-considered dicta of the Second Circuit that the statute calls for a program-by-program analysis.  Accordingly, Glaser must show not only that

Defendants offered an educational program, but also that he was excluded from or denied the benefits of that specific program.

The problem for Glaser is that he cannot rely on his former participation in the Training Center's courses to state a Title IX claim. In granting Defendants' first motion to dismiss, this Court observed that Glaser had "pleaded that his time as a student at" the Training Center "ended years before Defendants' allegedly discriminatory conduct." *Glaser*, 377 F. Supp. 3d at 398. Six years separated his last Training Center class and the ban. Because Glaser had "moved on from Defendants' educational programs by the time of Defendants' allegedly unlawful discrimination," this Court held in its prior decision, Defendants' ban from the Training Center did not deprive him of "equal access to an educational program or activity" in violation of Title IX. *Id.* at 399 (quotation marks and citation omitted). That law of the case still controls.

That holding was tempered, though, by the acknowledgement that "prospective applicants to a covered educational program may bring such suits." *Id.* Glaser now seeks to rely on that qualification, asserting that he was a prospective student because he was qualified to apply to (and solicited for) the Advanced Study program. (Dkt. No. 116 at 33–34.) The trouble, however, is that Glaser has not alleged that he had applied to or had any intention or desire to apply to the Training Center's advanced courses. He thus is no more a prospective advanced student than any layperson is a prospective entry-level student. This defect is not merely statutory: Glaser lacks *constitutional* standing to advance a claim based on the deprivation of an opportunity he had no intention of pursuing, because the injury flowing from that deprivation is not "actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992). The ban did not inflict an Article III injury insofar as it precluded Glaser's participation in the Advanced Study program, and Glaser cannot prevail on a claim predicated on that alleged harm alone.

The question remains, then, whether Glaser's Title IX claim can survive based on the deprivation of the ability to perform his monthly stand-up show at the theaters.[2] This in turn depends on whether the performance opportunity was educational within the meaning of Title IX.  The term "education" must be given its "ordinary meaning," but, as the Eighth Circuit has observed, "[t]he ordinary meaning of education is very broad and could conceivably encompass every experience of life."  *Roubideaux v. N. Dakota Dep't of Corr. & Rehab.*, 570 F.3d 966, 977 (8th Cir. 2009).  The Second Circuit has offered little guidance, beyond the circular instruction that a covered program "must have features such that one could reasonably consider its mission to be, at least in part, educational." *O'Connor*, 126 F.3d at 117.  The Third Circuit, consistent with the Second Circuit's analysis and the ordinary meaning of the term "education," has considered whether "a program is incrementally structured through a particular course of study or training," whether "a program allows participants to earn a degree or diploma, qualify for a certification or certification examination, or pursue a specific occupation or trade beyond mere on-the-job training," whether "a program provides instructors, examinations, an evaluation process or grades, or accepts tuition," and whether "the entities offering, accrediting, or otherwise regulating a program hold it out as educational in nature." *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 556 (3d Cir. 2017).

---

[2] Defendants contend that Glaser lacks "statutory standing" to bring this claim because he was neither a student nor an employee of UCB. (Dkt. No. 113 at 24.)  The framing of the issue as implicating Glaser's statutory standing misses the mark.  To say that a plaintiff has "statutory standing" is an outmoded way to say that he or she has a cause of action under the statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).  Here, Glaser argues that, as a performer, he was a participant in a covered educational program (the theaters' performance opportunities).  It is beyond dispute that the educatees of qualified educational programs who suffer discrimination have a cause of action under the statute, as they form the very core of the zone-of-interests protected by Title IX. *See id.* at 127.  Labels aside, however, Defendants' contentions have merit, for the reasons explained in this opinion.

Here, Glaser received no systematic instruction or feedback; he followed no incremental or structured course of training; the course of performances did not culminate in a degree or diploma or qualify him to pursue a specific occupation or certification (indeed, it was not finite at all); and there were no instructors, examiners, or teachers. *See Doe*, 850 F.3d at 556. To be sure, experiential, clinical, or experimental learning opportunities may resist easy classification, and these factors are not exhaustive. But Glaser's monthly show bears *none* of the hallmarks of an educational program.

Glaser's arguments to the contrary are unpersuasive. He emphasizes the interrelation between the Training Center and the theaters. For example, the Training Center Guide described performing as an important component of studying sketch and improv comedy and touted performance opportunities at the theaters for students (*see* TAC Ex. C at 9); certain of the Training Center's classes were prerequisites to applying to some performance opportunities (*see id.* at 9–10); and having performed was a prerequisite to other of UCB's classes (*see id.* at 5). That UCB encouraged Training Center students to perform and provided opportunities for them to do so, however, does not compel the conclusion that any opportunity to perform, irrespective of whether the performer was a Training Center student, is an educational program within the meaning of the statute. Similarly, that performance was a prerequisite to application to some classes does not mean performance itself was an educational opportunity, just as, say, a requirement that MBA applicants have work experience would not perforce transform pre-business-school employment into educational programs under the statute. Glaser also notes that on occasion, he solicited and received feedback from O'Neill on Midnight Stand-Up and his career more generally. (*See* TAC ¶¶ 113–116.) But the handful of stray emails he alleges over the three-year period providing solicited advice does not constitute the kind of systematic

instruction characteristic of an educational program.  Because the performance of the stand-up show was not an educational program, any sex discrimination occasioned by the ban did not fall within Title IX's ambit.  Glaser's Title IX claim is therefore dismissed.

### B. Plaintiff's Remaining Claims

Because Glaser's federal claims have been dismissed, this Court must determine whether to exercise supplemental jurisdiction over his remaining city- and state-law claims. (FAC ¶¶ 156–87, 213–49.)  Where a district court has original jurisdiction over certain claims in an action, and additional claims "form part of the same case or controversy," the court has supplemental jurisdiction over the additional claims.  28 U.S.C. § 1367(a).  However, a court "may decline to exercise supplemental jurisdiction over" the additional claims on various grounds, including where "the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims.").  Here, because all of Glaser's federal claims have been dismissed at an early stage of this litigation, the Court declines in its discretion to exercise supplemental jurisdiction over Glaser's remaining city- and state-law claims.  Accordingly, all of Glaser's remaining claims are dismissed without prejudice.

A subset of Defendants have separately moved to dismiss Plaintiff's claims against them pursuant to Rules 12(b)(2) for lack of personal jurisdiction. (Dkt. No. 113 at 12–17.)  Ordinarily, courts address challenges to personal jurisdiction and other threshold matters before addressing the merits of a claim.  *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431–32 (2007) ("[A] federal court generally may not rule on the merits of a case without first

determining that it has jurisdiction over the . . . parties (personal jurisdiction)."). But "in cases such as this one with multiple defendants — over some of whom the court indisputably has personal jurisdiction — in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action, we may address first the facial challenge to the underlying cause of action and, if we dismiss the claim in its entirety, decline to address the personal jurisdictional claims made by some defendants." *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012). Here, the Court has resolved to dismiss all of the claims against all Defendants in light of their merits-based challenges to Plaintiff's claims, and the Court would have been required address those merits-based challenges regardless of the outcome of the personal jurisdiction challenge because they were raised by Defendants over whom the Court indisputably has personal jurisdiction. Accordingly, the Court need not and does not address the personal jurisdiction challenge.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion dismiss is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 111 and to close this case.

SO ORDERED.

Dated: March 31, 2020
       New York, New York

_____
J. PAUL OETKEN
United States District Judge